■ Building Service Local 32B-J Pension Fund et al., Respondents, v 101 Limited Partnership, Appellant. [981 NYS2d 682]—

Order, Supreme Court, New York County (Melvin L. Schweitzer, J.), entered March 15, 2013, which granted plaintiffs' motion for partial summary judgment dismissing defendant's counterclaim for delay damages and for an order dissolving the injunction bond posted by plaintiffs, modified, on the law, to deny that part of the motion seeking to dissolve the bond, and to reinstate the bond, and otherwise affirmed, without costs.

Defendant landlord leased a 24-story office building to plaintiff tenants pursuant to several net leases that expired on December 31, 2011 (collectively, the lease). The lease contained several provisions governing repairs to the building. Section 33.01 required the tenants, at the end of the lease term, to surrender the premises in good condition (the surrender clause). Pursuant to sections 12.01 (a) and 15.02, the tenants were required, during the lease term, to take good care of and make repairs to the premises and equipment therein (the upkeep clause). The lease further provided that if the tenants defaulted in their ongoing repair obligations, the landlord itself could perform the necessary repairs (§ 21.01 [a]), and that the tenants were required to permit the landlord to enter the premises to do so (§ 20.01).

On December 23, 2010, the landlord sent the tenants a notice declaring that they were in default of the upkeep clause for failing to make repairs to certain building systems. The notice advised the tenants that if they did not commence the repair work within the 25-day cure period set forth in the lease, the landlord would exercise its right to enter and perform the repairs itself.

On January 13, 2011, the tenants filed a complaint in this action seeking, inter alia, a declaration that they are not in default of the lease and are not responsible for performing the repairs identified in the landlord's default notice. The tenants also moved for a preliminary injunction preventing the landlord from entering the premises to cure the alleged default. The landlord opposed the application and, in the event the injunction were granted, requested a bond to cover the delay damages it would incur if it had to postpone the repairs until after the lease term ended. In other words, the landlord asked for a bond amount sufficient to cover the rent it would lose during the time it performed the repairs after the tenants vacated. On March 7, 2011, the motion court granted the preliminary injunction upon the condition that the tenants post a bond in the amount of $4,708,242.[1] The tenants subsequently posted the bond.

On June 6, 2011, the landlord answered the tenants' complaint and asserted a counterclaim alleging breach of the upkeep clause. The counterclaim sought damages to cover the cost of the repairs, along with delay damages allegedly incurred as a result of the tenants' obtaining the injunction to prevent the landlord from entering the premises. On or before December 31, 2011, the end of the lease term, the tenants vacated the building and surrendered possession to the landlord. In October 2012, the tenants moved for partial summary judgment dismissing the landlord's counterclaim to the extent it sought delay damages and for an order dissolving the bond. By order entered March 15, 2013, the court granted the tenants' motion.

The motion court properly dismissed the landlord's counterclaim for delay damages. It is well settled that lost rent is not recoverable as damages for breach of a lease covenant requiring a tenant to keep the premises in good repair. An action alleging breach of such a covenant can be brought either before or after the expiration of the lease term (*City of New York v Pennsylvania R.R. Co.*, 37 NY2d 298, 301 [1975]). In *Appleton v Marx* (191 NY 81 [1908]), the Court of Appeals identified two different measures of damages, depending on when the action is commenced. If the action is brought before the lease expires, a landlord can recover "the injury done to the reversion" (*id.* at 83), i.e. "the difference between the value of the premises with the improvement and absent the improvement" (*Tobin v Union News Co.*, 18 AD2d 243, 245 [4th Dept 1963], *affd* 13 NY2d

---

**1.** Although the motion court referred to the injunction as a *Yellowstone* injunction, the landlord's default notice did not seek to terminate the tenancy (*see First Natl. Stores v Yellowstone Shopping Ctr.*, 21 NY2d 630 [1968]).

1155 [1964]). On the other hand, if the action is brought after the expiration of the lease term, "the measure of the damages is the cost of putting the premises into repair" (*Appleton*, 191 NY at 83; *accord Pennsylvania R.R. Co.*, 37 NY2d at 301; *Farrell Lines v City of New York*, 30 NY2d 76, 84 [1972]). In neither circumstance, however, did the Court of Appeals provide that lost rent is included in the measure of damages.

Courts in this state have consistently followed this rule. For example, in *Solow Mgt. Corp. v Hochman* (191 AD2d 250, 251 [1st Dept 1993], *lv dismissed* 82 NY2d 802 [1993]), we rejected the landlord's claim for lost rent arising out of the tenant's failure to restore the premises to their original condition, concluding that the measure of damages was limited to the reasonable costs of restoring the premises. Likewise, in *Charlebois v Carisbrook Indus., Inc.* (23 AD3d 821 [3d Dept 2005]), where a lease provision required the tenants to maintain the premises and perform preventive maintenance of building systems, the court dismissed the landlords' claim for rent lost while the repairs were being made (*see also Arnot Realty Corp. v New York Tel. Co.*, 245 AD2d 780, 782 [3d Dept 1997]; *Mudge v West End Brewing Co.*, 145 App Div 28, 31 [3d Dept 1911], *affd* 207 NY 696 [1913]; *Orkin's Fashion Stores, Inc. v S.H. Kress & Co.*, 68 NYS2d 764 [Sup Ct, NY County 1947], citing *Mudge*). We see no reason to depart from this well established principle.

The dissent attempts to distinguish this body of case law by suggesting that New York's rule precluding damages for lost rent does not apply here because the landlord alleges breach of the upkeep clause, not the surrender clause. The case law, however does not recognize such a distinction, and, in fact, courts have applied the rule to both types of repair covenants (*see Charlebois*, 23 AD3d at 821; *Arnot Realty Corp.*, 245 AD2d at 780; *Orkin's Fashion Stores*, 68 NYS2d at 765). Contrary to the dissent's view, the landlord is not deprived of a remedy for breach of the upkeep clause, and may seek the appropriate measure of damages provided for by Court of Appeals precedent. The dissent cites no cases that allow for the recovery of lost rent for breach of a repair covenant. Instead, relying on general contract principles, the dissent proposes that we permit such damages because they were foreseeable. However, none of the cases setting forth the proper measure of damages for breach of a repair covenant employed the foreseeability analysis urged by the dissent.

The dissent points out that the lease here contains no express limitation on the landlord's right to recover damages. Although that is true, the lease also does not specifically provide for

recovery of consequential damages in the form of lost rent. This Court's recent decision in *New York Univ. v Cliff Tower, LLC* (107 AD3d 649 [1st Dept 2013]) is instructive. In that case, we dismissed a landlord's claim for lost rent based on a breach of a repair covenant, concluding that "[n]othing in the relevant lease provisions provided for additional rent beyond the term of the lease as part of the damages for restoring the premises to the agreed upon condition" (107 AD3d at 649). The same result should occur here. Having failed to include a provision in the lease allowing for recovery of lost rent, the landlord is barred from obtaining such damages (*see Chemical Bank v Stahl*, 255 AD2d 126 [1st Dept 1998] [denying landlord's lost rent claim where the parties' agreement did not provide for the award of such consequential damages]).

There is no merit to the landlord's argument that it is entitled to recover lost rent under a holdover theory. It is undisputed that the tenants had vacated the premises by the time the lease term ended, and courts have repeatedly rejected attempts to analogize similar facts to holdover tenancies (*see Chemical Bank*, 255 AD2d at 127 [rejecting landlord's attempt to recover lost rental income on the theory that tenant held over its tenancy]; *Arnot Realty Corp.*, 245 AD2d at 782 ["a tenant who has vacated premises but breached covenants to repair cannot be held liable for holdover rent while the repairs are made and the premises unleased"]). The landlord's reliance on *Niagara Frontier Transp. Auth. v Euro-United Corp.* (303 AD2d 920 [4th Dept 2003]) is misplaced. In that case, a holdover tenancy was found because the tenant, upon vacating the premises, left behind "massive pieces of equipment" that prevented the landlord from leasing the premises to a new tenant (303 AD2d at 921, 923). Here, in contrast, the landlord does not allege that the tenants left behind any property that prevented it from reletting the premises.

Contrary to the dissent's view, the landlord cannot recover, as part of its counterclaim, damages it allegedly sustained as a result of the court's issuance of the preliminary injunction. "Absent proof of malice, not asserted here, there is no common-law or statutory right to recover damages sustained as a result of an improperly issued preliminary injunction" (*Thompson v Topsoe*, 237 AD2d 113, 113-114 [1st Dept 1997]). Instead, the undertaking posted in connection with issuance of the injunction provides the sole basis for relief (*see Honeywell, Inc. v Technical Bldg. Servs.*, 103 AD2d 433, 434 [3d Dept 1984]).

We conclude that the motion court prematurely discharged the bond because there has been no determination as to whether

the tenants were entitled to the preliminary injunction (*see J. A. Preston Corp. v Fabrication Enters.*, 68 NY2d 397 [1986]; *2339 Empire Mgt., LLC v 2329 Nostrand Realty, LLC*, 71 AD3d 998 [2d Dept 2010]). If the injunction was warranted, then the landlord will not be entitled to any damages arising from its issuance. However, if it is finally determined that the tenants were not entitled to an injunction, the landlord will be entitled to recover, against the undertaking, "all damages and costs which may be sustained by reason of the injunction" (CPLR 6312 [b]).

Although lost rent is not an available measure of damages on the landlord's counterclaim, we cannot conclude, on this record, as a matter of law, that lost rent is not recoverable as damages against the undertaking. We note that the parties, on appeal, did not cite to CPLR 6312 (b), and the motion court did not address that provision when it dissolved the bond.[2] The tenants' contention that the bond was properly vacated because the landlord did not lose any rental income as a result of the injunction presents issues of fact inappropriate for summary disposition. In reinstating the bond, we understand, as the tenants argue, that the landlord ultimately may not be able to prove actual damages, but it is not possible for us, at this juncture, to definitively resolve this factual issue. Concur—Richter, Manzanet-Daniels and Feinman, JJ.

Friedman, J.P., and Andrias, J., concur in part and dissent in part in a memorandum by Andrias, J., as follows: The majority finds that landlord's sole remedy is to seek damages under the bond, if it is finally determined that tenants were not entitled to the preliminary injunction they obtained in this case, and that the motion court correctly dismissed landlord's counterclaim for delay damages. Because I believe that, on the record before us, landlord is entitled to seek delay damages under both the bond and under a breach of contract theory based on tenants' breach of the clause authorizing landlord to enter the premises to perform repair work during the lease term if tenants refused to do so, I concur in part and dissent in part.

In the period of 1989-1991, landlord constructed a new 24-story class A office tower at 101 Avenue of the Americas, consisting of more than 400,000 square feet of office space. Landlord leased the entire building to tenants on a net lease basis, for an initial 20-year term, with eight renewal options that could potentially extend the lease for approximately 79 years. Tenants elected not to extend the lease beyond December 31, 2011, at which time the lease expired.

---

2. The parties did reference this statute in earlier briefing before the motion court as to the proper amount of the bond.

Pursuant to section 12.01 of the lease, tenants were required throughout the lease term, inter alia, to replace certain building-wide systems as they became obsolescent (the upkeep clause), so as to maintain the building in first-class condition. Pursuant to section 33.01, as of the end of the lease term, tenants were required to return the building to landlord in good repair (the surrender clause).

Section 21.01 (a) of the lease provided that "[i]f there shall be an Event of Default under this Lease, then Landlord, without waiving or releasing Tenant from any obligation of Tenant contained in this lease, may (but shall be under no obligation to) perform such obligations on Tenant's behalf." Section 20.01 required tenants to permit landlord: "to enter the Premises at all reasonable times (but not more frequently than is reasonable under the circumstances), on at least seven days' notice . . . for the purposes of . . . (b) making any Repair . . . which Landlord . . . is permitted to perform pursuant to the terms of this Lease, . . . or (d) during the continuance of an Event of Default, making any Repairs to the Premises and/or performing any work therein, whether necessitated by a Requirement or otherwise."

Section 20.02 provided that "Landlord . . . shall not be liable for inconvenience, annoyance, disturbance, loss of business or other damage of Tenant or any Subtenant by reason of performing such . . . Repair or other work."

In April 2010, landlord informed tenants that they needed to immediately replace certain building systems that were allegedly obsolescent. Tenants refused. On December 15, 2010, tenants commenced this action seeking to recover revenue-sharing proceeds that the landlord had withheld. On December 23, 2010, landlord sent tenants a notice advising them "that Landlord has determined that you are in default of your obligations under Lease § 12.01 and § 15.02, in that you have failed to properly maintain and make 'Repairs' to the Building in each of the respects noted in Landlord's prior itemizations." The notice specified five categories of repair work and advised tenants that they were required to cure their defaults pursuant to section 24.01 (d) by completing, or at a minimum, commencing that work within 25 days, and that "if you fail to timely cure each and all of the above-referenced defaults . . . within the time specified in Lease § 24.01 (d), then Landlord intends to exercise its right under Lease § 21.01 (consistent with Landlord's rights under Art. 20) to perform each and all of said Repair work itself, on Tenant's behalf."

On January 18, 2011, tenants moved by order to show cause

for a temporary restraining order and injunction preventing landlord from, among other things, "taking any action, including issuing any further notice or entering the Premises and interfering with such parties' right of quiet enjoyment, for alleged purposes of 'curing' any defaults in the Retaliatory Notice, or otherwise interfering with such parties' possession of the Premises." Tenants sought the injunction on the ground that allowing landlord to perform the repair work during the remaining year of the lease would be highly disruptive to their ongoing occupancy.

Supreme Court issued the temporary restraining order and on February 17, 2011 held a hearing on the preliminary injunction. At the hearing, landlord argued that a bond should be required as a condition of the quasi *Yellowstone* injunction requested by tenants, to cover, among other things, the "delay damages" it would incur if it had to wait until tenants vacated the building before it commenced the necessary repairs. After tenants' counsel acknowledged that tenants did not want landlord to go in and do the work before the expiration of the lease because it would upset tenants' tenant, the court commented:

"I mean, I think it's coming down to this: I either give you a limited Yellowstone that takes care of this issue of eviction, or I give you the broader Yellowstone, but on the condition that the mediation encompasses delay damages and that there's a bond that includes the prospective delay damages. I don't know what amount we're talking about, but it's certainly not going be $18 million, but something of that sort.

"You can't have everything."

On February 24, 2011, after the parties submitted additional papers, the court issued the broader injunction requested by tenants prohibiting landlord from, among other things, entering the building to conduct the repair work while tenants were in occupancy, and ordered tenants to post a bond in the sum of $4,708,242, which tenants timely posted.

On or about June 6, 2011, landlord served an answer in which it sought, as a separate element of damages on its first counterclaim, delay damages caused by the injunction, by which tenants blocked landlord from repairing the obsolescent systems during the balance of tenants' lease term, as it sought to do in its notice. In October 2012, tenants moved for summary judgment dismissing the delay damages claim, arguing that the work was now done at less cost ($4.9 million as opposed to $7.4 million) and in less time (7½ months as opposed to 9 months) than would have been the case if it had been performed while they

occupied the building. Tenants also argued that landlord undertook unrelated work during that time period by performing a gut renovation, and could not have rented the premises in any event. Insofar as landlord claimed that it would have been ready to re-let on January 1, 2012, tenants contended that there was nearly a year's hiatus in landlord's efforts to relet due to a disagreement among internal factions of landlord. Tenants also claimed that, as a matter of law, landlord was not entitled to delay damages under a holdover theory.

Supreme Court granted tenants' motion, stating: "The court agrees with plaintiffs that the rule in New York is well established that the covenant to surrender property in good condition at the end of the lease relates only to the physical condition of repair. The rule of damages applicable to such covenant precludes the idea that loss of rent is included in it. There is no exception to the rule precluding recover of lost rent as delay damages. Plaintiffs were not holdovers because of defendant's repair claims and cannot be liable for holdover rent."

However, CPLR 6312 (b) expressly requires an undertaking to be filed to cover potential damages that could result from granting an injunction. "The purpose and function of an undertaking given by a plaintiff . . . is to reimburse the defendant for damages sustained if it is later finally determined that the preliminary injunction was erroneously granted" (*Margolies v Encounter, Inc.*, 42 NY2d 475, 477 [1977]).

Here, landlord's delay damages claim is based on tenants' obtaining a broad injunction that prevented landlord from exercising its explicit contractual right to enter the premises to perform work itself, after tenants refused to do so, before the expiration of the lease and tenants' surrender of the premises. The injunction was conditioned on tenants' posting a bond which foresaw that the issuance of the injunction might interfere with landlord's anticipated rental income after tenants surrendered the premises and that the damages incurred in the event it was determined that tenants were not entitled to the injunction would include delay damages.

Under these circumstances, in the event it is determined that tenants were not entitled to an injunction, landlord is entitled to recover, if proved, all foreseeable damages contemplated by the bond, including delay damages.

Landlord also has a viable breach of contract claim based on tenants preventing it from exercising its contractual right to immediately perform the repairs during the lease term that were required by the upkeep clause.

Section 24.01 (d) of the lease provides that an event of default

shall occur "if Tenant shall fail to observe or perform one or more of the other terms, conditions, covenants or agreements of this Lease or the Operating Agreement and such failure shall continue for a period of 25 days after written notice thereof by Landlord to Tenant specifying such failure." Section 24.02 provides that "[i]f an Event of Default shall occur, Landlord may elect to proceed by appropriate judicial proceedings, either at law or in equity, to enforce the performance or observance by Tenant of the applicable provisions of this Lease and/or to recover damages for breach thereof."

The lease contains no limitation on landlord's right to recover damages for a default under the upkeep clause or from tenants' blocking landlord's contractual right to perform the systems repair work itself if tenants fail to do so. Thus, landlord is entitled to recover its economic losses, including delay damages, if proved, that were caused by tenants' breach and that the parties had reason to foresee as a likely result of the breach (see *Inchaustegui v 666 5th Ave. Ltd. Partnership*, 96 NY2d 111, 116 [2001] ["Under settled contract principles, however, the landlord . . . is entitled to be placed in as good a position as it would have been had the tenant performed"]; *Ashland Mgt. v Janien*, 82 NY2d 395, 403 [1993]; *Goodstein Constr. Corp. v City of New York*, 80 NY2d 366, 374 [1992]; *Kenford Co. v County of Erie*, 73 NY2d 312, 319 [1989]). This is of particular importance to a landlord in a long-term net lease that obligates the tenant to keep building systems up to date so as to maintain its class A status, and to hold otherwise would essentially read the upkeep clause and landlord's right to perform the repairs itself during the lease term out of the lease.

Cases such as *New York Univ. v Cliff Tower, LLC* (107 AD3d 649, 649 [1st Dept 2013]), on which the majority relies, are inapposite since landlord's claim here is based on the upkeep clause, not the surrender clause, and since delay damages were contemplated when the injunction was issued at tenants' behest to prevent the landlord from exercising its contractual right to self-help.

The majority notes that upon vacating the premises, tenants left nothing behind preventing landlord from reletting the premises to a new tenant. This misses the point. The lease obligated tenant to replace obsolescent systems so as to maintain the building's class A status, thereby protecting its rental value, and the fact that tenants left nothing behind is not relevant to their breach of the upkeep clause and their decision to prevent landlord from performing the repairs during the lease term. Insofar as tenants contend that the evidence in the record

undermines landlord's claim that it was prepared to relet the premises upon the expiration of tenants' lease, or that landlord did not in fact incur any delay damages because the necessary repairs could have been made within the same time period as the gut renovation, these arguments raise issues of fact, which may not be determined on a motion for summary judgment.

Accordingly, I would reverse, and deny the dismissal of defendant's counterclaim for delay damages and reinstate the bond.